2020 IL App (2d) 190949-U
No. 2-19-0949
Order filed March 30, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* PARENTAGE OF A.E.C., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| | ) | |
| | ) | No.  18-F-271 |
| | ) | |
| | ) | Honorable |
| (Jorge C., Petitioner-Appellant v. Suni A., | ) | Neal W. Cerne, |
| Respondent-Appellee). | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Presiding Justice Birkett and Justice Brennan concurred in the judgment.

**ORDER**

¶ 1   *Held:*   (1) The trial court did not err in denying father's motion to dismiss mother's petition for relocation; (2) the trial court did not err in allowing mother to proceed on her relocation petition; and (3) the trial court's decision to grant mother's petition to relocate to California with minor was not against the manifest weight of the evidence.

¶ 2                                I.  INTRODUCTION

¶ 3   Petitioner, Jorge C., appeals from an order of the circuit court of Du Page County denying his motion to dismiss the petition of respondent, Suni A., to relocate to California with A.E.C., the parties' minor child, and the court's subsequent order granting Suni's relocation petition. On appeal, Jorge argues that the trial court erred in denying his motion to dismiss Suni's relocation

petition because: (1) Suni had not been allocated either a majority of parenting time or equal parenting time, which are statutory requirements for filing a relocation petition (750 ILCS 5/609.2(b) (West 2018)); (2) Suni failed to comply with the statutory notice requirements for filing a relocation petition (750 ILCS 5/609.2(c), (d) (West 2018)); and (3) Suni failed to respond to his motion to dismiss, thereby deeming the allegations therein admitted. Jorge also asserts that the trial court erred in allowing Suni to proceed on her relocation petition because "she had not filed any other pleading seeking allocation of parental responsibilities." Finally, Jorge contends that the trial court's decision to grant Suni's petition to relocate to California with A.E.C. was against the manifest weight of the evidence. We affirm.

¶ 4                                    II. BACKGROUND

¶ 5      Suni was born and raised in California. She met Jorge while he was in the Marine Corps and stationed at Camp Pendleton in California. On September 3, 2015, Suni gave birth to A.E.C. in Illinois. Upon A.E.C.'s birth, Jorge signed a voluntary acknowledgement of paternity. Thereafter, the parties, who never married, traveled with A.E.C. between Illinois and California. On May 17, 2018, Jorge filed in the circuit court of Du Page County a "Petition to Establish Parentage and Other Relief." In his petition, Jorge alleged, *inter alia*, that from A.E.C.'s birth until the date of the relocation petition, the parties had shared parenting responsibilities for A.E.C. The petition further alleged that in February 2018, the parties traveled to California to visit Suni's family, intending to return to Illinois. However, Suni refused to return A.E.C. to Illinois and is "unjustifiably concealing" him from Jorge. Among other things, Jorge asked the court to declare him to be the natural father of A.E.C., grant him "sole allocation of care, control, and education of A.E.C.," designate him as the primary residential parent subject to a set parenting schedule for Suni, and require Suni to pay support.

¶ 6     On or about May 3, 2018, Suni filed in California a petition for a temporary restraining order against Jorge, alleging a patten of abuse since October 2015. On May 23, 2018, Suni's petition was dismissed due to Suni's failure to appear at the hearing. Suni subsequently filed another petition for a restraining order in California.

¶ 7     Meanwhile, on May 29, 2018, Jorge filed an emergency motion seeking the return of A.E.C. to Illinois pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) (750 ILCS 36/101 *et seq*. (West 2018)). Jorge alleged that Illinois is A.E.C.'s home state because, apart from the three months preceding the filing of the emergency motion, A.E.C. had lived his entire life in Illinois. On May 31, 2018, the trial court entered an order granting Jorge's emergency motion, designating Illinois as A.E.C.'s home state for jurisdictional purposes, granting temporary possession of A.E.C. to Jorge until further order of the court, granting Jorge permission to transport A.E.C. to Illinois, and ordering Suni to cooperate with Jorge and local law enforcement authorities to safely return A.E.C. to Illinois.

¶ 8     On June 21, 2018, the trial court entered an order granting Suni 21 days to file a response to Jorge's parentage petition. On June 22, 2018, Suni's attorney entered an appearance on her behalf.  On July 12, 2018, Suni filed a motion to vacate the May 31, 2018, order granting Jorge's May 29, 2018, emergency motion. On July 16, 2018, the trial court entered an order taking Suni's motion to vacate off the call. On July 18, 2018, Suni was granted 14 days to amend her motion to vacate the trial court's May 31, 2018, order and plead it as a section 2-1401 petition. Also on July 18, 2018, Jorge filed a verified petition for order of protection. On July 30, 2018, Suni filed a motion to dismiss Jorge's verified petition for order of protection, arguing, *inter alia*, that a temporary restraining order Suni filed in California was the equivalent of an emergency order of protection and is subject to enforcement in Illinois. On August 2, 2018, Suni filed a combined

motion to reconsider and motion to dismiss with prejudice, requesting that the May 31, 2018, order be vacated, that California be found to be the more convenient forum under the UCCJEA, and that California be declared A.E.C.'s home state.

¶ 9       On September 5, 2018, the superior court of California, while acknowledging the existence of home state jurisdiction in Illinois, entered an emergency custody order due to "concerns about the safety of the child in [Jorge's] care based on the allegations in the declaration of [Suni]."

¶ 10      On September 14, 2018, the trial court entered an order appointing Karen Delveaux as the guardian *ad litem* (GAL) for the minor. Also on September 14, 2018, the trial court entered an order denying Suni's motion to dismiss Jorge's verified petition for an order of protection, denying Suni's combined motion to reconsider and motion to dismiss with prejudice, declaring again that Illinois is the home state of A.E.C. pursuant to the UCCJEA, and noting that California has asserted emergency jurisdiction for the limited purpose of Suni's petition for temporary restraining order which should indicate an end date if issued. On October 12, 2018, Suni filed her response to Jorge's parentage petition.

¶ 11      On October 29, 2018, an order of protection was entered by the California court with an expiration date of April 30, 2020.  The order lists Suni as the "protected person" and Jorge as the "restrained person," although the court hearing the matter found that "both parties acted as the primary aggressor and neither party acted in self defense." Attached to the California order of protection was a temporary emergency order allocating legal and physical custody of A.E.C. to Suni and electronic parenting time to Jorge. The order also provided that it was a "temporary custody order pending determination by the court in Illinois."

¶ 12      On October 31, 2018, the trial court entered an order adjudicating Jorge the biological father of A.E.C. and granting Jorge leave to file a petition to return A.E.C. to Illinois. On November

6, 2018, Jorge filed a motion to enforce the May 31, 2018, order and return A.E.C. to Illinois *instanter* pursuant to the UCCJEA. That same day, Jorge also filed a petition for allocation of temporary parenting responsibilities, regular parenting time, and holiday parenting time. In the petition, Jorge requested that he be awarded temporary sole allocation of parental responsibilities of A.E.C. and temporary primary residence of A.E.C. and that the court enter a temporary parenting schedule and holiday parenting schedule. On November 27, 2018, Suni filed a response to Jorge's motion to enforce and also filed a motion to strike and dismiss Jorge's petition for allocation of temporary parenting responsibilities.

¶ 13　On November 29, 2018, the parties entered into an agreed temporary allocation order which provided in relevant part that Illinois retains jurisdiction of the parties and the subject matter, Illinois remains the home state of A.E.C., and the parties shall cooperate to return A.E.C. to Illinois for Jorge's parenting time. The agreed temporary allocation order also awarded Jorge parenting time with A.E.C. from December 20, 2018, through January 6, 2019, with the parties thereafter alternating parenting time in three-week intervals, with A.E.C. traveling to California for Suni's parenting time and to Illinois for Jorge's parenting time. In addition, the parties were ordered to continue allowing A.E.C. to communicate with the other parent through electronic means.

¶ 14　On February 6, 2019, Jorge filed an emergency motion for A.E.C. to remain in Illinois and other relief. In the emergency motion, Jorge asserted that the intention of the alternating three weeks of parenting time provided in the November 29, 2018, order was to allow him to make up lost parenting time with A.E.C. and to allow the GAL to investigate his living conditions and observe Jorge's interaction with A.E.C. Jorge stated that after completing the home visits, the GAL had no concerns about the minor being placed in Jorge's primary care should Suni elect not to return to Illinois. Jorge alleged that there had been no indication that Suni intended to return to

reside in Illinois. Moreover, Jorge expressed concern about Suni's living arrangements in California, alleging that Suni resided part of the time in her parents' home with seven other adults and part of the time at her boyfriend's apartment. Jorge asserted that these living arrangements have caused "confusion and harmful instability" for A.E.C. while the frequent travel between Illinois and California has caused stress for A.E.C. Jorge requested entry of an order (1) awarding him sole allocation of parental responsibilities of A.E.C. and "the primary residence of the minor" subject to reasonable parenting time for Suni when she travels to Illinois and (2) modifying the November 29, 2018, order to no longer require A.E.C. to travel to California and requiring respondent to be present in Illinois to exercise her parenting time.

¶ 15     On February 7, 2019, the trial court entered an order finding that an emergency exists with respect to Jorge's February 6, 2019, emergency motion. The court ordered A.E.C. to remain in Illinois temporarily until the GAL had an opportunity to complete her investigation. The court did not suspend Suni's parenting time but ordered that she exercise it in Illinois until further order of the court. On February 25, 2019, Suni's attorneys filed a motion to withdraw, alleging that differences had arisen between them and Suni rendering it impossible for them to be of proper counsel to Suni. On March 4, 2019, the trial court granted Suni's attorneys leave to withdraw.

¶ 16     On April 4, 2019, the parties entered into a temporary agreed order that stated in relevant part as follows:

> "1.   JORGE is designated as the parent with the majority of the parenting time with the minor child for the purposes of Section 750 ILCS 5/606.10. Illinois is designated as the permanent residence of the minor child. JORGE shall have parenting time with the minor child at all times not specifically designated as SUNI'S parenting time. Temporarily Jorge has the sole parental responsibilities of the minor child.

2. The parties shall cooperate to allow SUNI Facetime with the minor child once a day between 7:00p.m. to 7:30p.m. for thirty (30) minutes subject to the minor child's attention span, and any other times the parties mutually agree upon.

3. The parties acknowledge that SUNI currently resides in California which for practical purposes limits her ability to enjoy an expanded parenting schedule. Therefore, SUNI shall enjoy parenting time, with the minor child as follows:

a. Weekends that the parties mutually agree upon in writing. SUNI shall notify JORGE of her intention to exercise parting [*sic*] time seven (7) days in advance and discuss if that weekend works for the parties' schedules. If the parties agree that the weekend works, then SUNI shall provide JORGE with a written itinerary twenty-four (24) hours in advance of her parenting time. The itinerary shall include SUNI's flight information, arrival and departure times, hotel reservation and contact information. SUNI shall not exercise her parenting time at an AIRBNB. The weekends exercised by SUNI shall occur from Friday at 5pm until Sunday at 8 p.m. SUNI's parenting time shall be exercised in the state of Illinois. The parties agree that SUNI shall secure a hotel in Schaumburg, Illinois during her stay in Illinois.

b. SUNI can also enjoy reasonable parenting time and any other time the parties mutually agree upon in writing."

The temporary agreed order further provided that Suni desires to have the GAL travel to California to investigate the safety of her "home and environment" and that Suni shall be solely responsible for the GAL's travel expenses to California.

¶ 17    On May 2, 2019, Suni entered her *pro se* appearance in this cause. On May 9, 2019, Suni filed in the circuit court of Du Page County a "Notice of Relocation." In the notice, Suni indicated

that she planned to relocate permanently to California with A.E.C. on May 14, 2019. Also on May 9, 2019, Suni filed a "Petition to Relocate with Minor Child(ren) and to Modify Parenting Plan/Allocation Order." In her relocation petition, Suni acknowledged that the notice she provided to Jorge was less than 60 days before her planned move. Suni explained that she was unable to give the 60 days' written notice required by statute (see 750 ILCS 5/609.2(c), (d) (West 2018)) because she "was previously represented by counsel, who did not enter the relocation request that [she] had requested," but she is filing the relocation petition on her own behalf now that she is representing herself. On May 13, 2019, the trial court entered an order granting Suni extended parenting time in California with A.E.C. from June 17, 2019, through July 28, 2019.

¶ 18    On May 29, 2019, Jorge filed a motion to dismiss Suni's relocation petition pursuant to section 2-619(a)(9) of the Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(9) (West 2018)). Jorge cited two bases for dismissal. First, he asserted that Suni failed to provide at least 60 days' written notice before the intended relocation as required by section 609.2(d) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/609.2(d) (West 2018)) and she failed to provide a legitimate excuse as to why such statutorily-required notice was impracticable. Second, Jorge alleged that the relocation statute prevented Suni from filing a petition because she had not been allocated a majority of parenting time and she does not share equal parenting time, which are minimum requirements for seeking relocation under section 609.2(b) of the Act (750 ILCS 5/609.2(b) (West 2018)). In support of the second basis for dismissal, Jorge relied on the April 4, 2019, temporary agreed order.

¶ 19    On June 17, 2019, the trial court held a hearing on Jorge's motion to dismiss. At the beginning of the hearing, Jorge's attorney told the court that an order had been entered on April 4, 2019, which awarded Jorge "the majority of the parenting time." In response, Suni stated:

"But it was supposed to be temporary while we set the status, because I live in California and I can't—I couldn't take [A.E.C.] back home with me because of the emergency custody order under his allegations that my home was unstable, which the [GAL] fly out [*sic*] to San Diego and she visited my home and she met my parents, and I don't know if she's had a chance to submit that yet or not."

Jorge's attorney then argued for the dismissal of Suni's relocation petition, asserting that Suni did not provide the statutorily-required 60 days' notice and that Suni could not properly file a petition to relocate under the statute because the April 4, 2019, order expressly designated Jorge as the parent with the majority of the parenting time for the purpose of section 606.10 of the Act (750 ILCS 5/606.10 (West 2018)). Jorge noted that while the April 4 order does allocate some parenting time to Suni, it "doesn't come close to equal parenting time."

¶ 20    Ultimately, the trial court denied Jorge's motion to dismiss, citing the fact that the April 4, 2019, order was a temporary order which can be modified at any time. The court stated that it had yet to decide whether Suni or Jorge would be designated the "primary parent" and that the relocation issue should be decided in conjunction with a final allocation of parental rights. Jorge's attorney reiterated his position that Suni's relocation petition was premature because it had not been determined that Suni had either the majority of parenting time or equal parenting time. The court responded, "technically, *** your client hasn't been decided the primary parent either." The trial court stated that the order allocating Jorge the majority of parenting time was "just serving to maintain the status quo" and there had not been a legal determination of the parties' rights. The trial court noted that the "status quo is the child is in Illinois." The court stated that it could vacate the temporary order but felt that doing so would "upset the status quo" and not "serve anything." The trial court denied the request of Jorge's attorney's for inclusion of Rule 304(a) language in the

order denying the motion to dismiss.

¶ 21    On July 9, 2019, Jorge filed a response and affirmative defenses to Suni's relocation petition. The affirmative defenses were the same two raised in the motion to dismiss, namely that Suni failed to comply with the notice requirement in section 609.2 of the Act and that Suni could not properly seek relocation because she had not been allocated either a majority of parenting time or equal parenting time.

¶ 22    On July 29, 2019, the trial court entered an order requiring the parties to exchange A.E.C. "4 weeks on 4 weeks off" as detailed in the order.  Thus, Jorge was awarded parenting time for four weeks from July 29, 2019, through August 25, 2019, and Suni was awarded parenting time from August 25, 2019, through September 22, 2019. The same order scheduled trial for September 19, 2019. On September 18, 2019, the Superior Court of California granted the parties' request to terminate the order of protection entered on October 29, 2018.

¶ 23    On September 19, 2019, the trial court conducted a hearing on Jorge's parentage petition and Suni's relocation petition. Before testimony was taken, the GAL stated that because of "some additional evidence" she received that morning she could not "as an officer of the court 100 percent stand behind [her] original recommendations." The GAL asked for some time to process the new information. The court responded that this new information would become part of the GAL's "report" and that she could testify to the new information.

¶ 24    Suni proceeded *pro se* at the hearing. Suni testified that she grew up in California and met Jorge when he was stationed at Camp Pendleton. After A.E.C. was born, Suni worked for a staffing agency in Illinois called Skyline Staffing and as a manufacturing supervisor at Conxall. While working for Skyline Staffing and Conxall, Suni would take A.E.C. to daycare.

¶ 25    Suni testified that in January 2018, she and Jorge moved to California with A.E.C. when

their apartment lease in Illinois expired. Jorge drove out to California first because he was not able to renew his California-issued commercial driver's license (CDL) in Illinois. Later in January, Suni and A.E.C. flew out to California. Suni and Jorge then returned to Illinois (leaving A.E.C. with Suni's parents) to clean out their apartment, dispose of their belongings, and drive their two other cars to California. When the parties arrived in California, they lived at Suni's parents' home, a one-bedroom, one-bathroom duplex in the town of Vista. At the time, seven people resided in the home—Suni, Suni's parents, Suni's brother, Suni's brother's girlfriend, Jorge, and A.E.C. Suni testified that Jorge renewed his CDL in California and found employment at Bassett Furniture in San Marcos. Suni obtained employment in California with Go Staff. Suni and Jorge separated in May 2018. Suni subsequently began dating another man.

¶ 26    In California, Suni works as a supervisor for Go Staff. Suni earned about $34,000 in 2018 and expected to earn $38,000 in 2019. Suni acknowledged that the cost of living in California is higher than the cost of living in Illinois but testified that she had room for growth at Go Staff and had received raises and job promotions with the company. Suni lives in a rented house with her parents and her brother. Suni acknowledged that her brother smokes medical marijuana to deal with pain from an injury related to a motorcycle accident. If her relocation petition is granted, Suni would place A.E.C. in daycare because her mother's schedule is inconsistent and her father works from 7 a.m. until 3 or 3:30 p.m. Suni noted that A.E.C. receives speech therapy in Illinois and testified that he can obtain equivalent therapy in California.

¶ 27    Suni testified that she was the primary caregiver for A.E.C. since his birth. According to Suni, Jorge was not a "very active parent" during A.E.C.'s infancy. Jorge changed A.E.C.'s diapers infrequently and did not bond a lot with the minor. Suni testified that it was not until the trial court entered the order requiring the parties to alternate custody in three-week intervals that Jorge had

overnight visitation with the minor. While Suni respects Jorge for wanting to be involved in A.E.C.'s life and she is happy that Jorge has built a relationship with A.E.C., she feels that she has been the more consistent parent.

¶ 28    Suni testified that she does not want to live in Illinois because her relationship with Jorge was "toxic" and she did not have a support system in Illinois. Suni opined that she and Jorge were not the best parents when they lived together in Illinois because their relationship was "so full of conflicts all the time." Suni testified that being a healthy parent for A.E.C. is the best thing she can do for him. She explained that if she keeps herself mentally healthy, "everything else follows, which allows me to be a present parent." Suni testified that she wants to remain in California because that is where her support system is. Suni stated that she is not calling any witnesses at the hearing because she does not have any family or close friends in Illinois. Suni believes that the support system A.E.C. has in California is equivalent to the one he has in Illinois. Moreover, she opined that the frequent traveling between California and Illinois has injected instability into A.E.C.'s life.

¶ 29    Suni acknowledged numerous times when she prevented Jorge from seeing A.E.C., explaining that she did so for safety reasons. When asked if she believes that Jorge can provide a safe and stable environment for A.E.C. in Illinois, Suni responded that she was not sure, but acknowledged that in her deposition she answered the same question affirmatively. Suni later acknowledged that Jorge is a fit parent to have joint parenting responsibilities and that A.E.C. loves Jorge.

¶ 30    Suni testified that she has two dogs in California. She stated that although both dogs live outside, one of the dogs is allowed in the home and A.E.C. is exposed to the animals "every once in a while." Suni acknowledged that A.E.C. was diagnosed with an allergy to dogs and testified

that on the morning of the hearing, she called her mother and asked her to remove the dogs from the house.

¶ 31   Regarding her relocation petition, Suni acknowledged that she did not provide the statutorily-required notice. Further, in response to a question by Jorge's attorney, Suni also acknowledged that she did not "actually have the majority of parenting time or equal parenting time" for A.E.C. when she prepared the petition. Suni explained that the parties "agreed *** on it like that," referring to the April 4, 2019, temporary agreed order. When asked by Jorge's attorney whether she entered into the temporary agreed order "freely and voluntarily," Suni responded that she felt like she did not have a choice. She stated that she indicated in her petition that she had equal parenting time because "[t]here was no other option."

¶ 32   Jorge testified that he resides in Roselle, Illinois. Jorge is employed as a truck driver and earns a gross monthly income of $2500. Jorge is a former Marine who was stationed in California. Jorge was present at A.E.C.'s birth in Illinois along with his mother, two of his sisters, and one of his nephews. Jorge testified that he has a very strong bond with A.E.C. and has been very active with the minor since birth. After A.E.C.'s birth, Jorge would come home from work at 2 p.m. and take over his care from Suni. Jorge changed A.E.C.'s diapers, played with him, fed him, rocked him to sleep, bathed him, brushed his gums and teeth, and read to him.

¶ 33   Jorge testified that after Suni returned to work in July 2016, the parties "really started sharing the parental responsibilities" because Suni was no longer a stay-at-home mother. Suni and Jorge would get home at around 3 p.m. Suni would make dinner while Jorge played with A.E.C., changed his diapers, and took him outside. After dinner, he and Suni would play with A.E.C. or watch cartoons until they began the bedtime routine of bathing, reading, and going to sleep. If Jorge bathed A.E.C., then Suni would put A.E.C. to sleep and vice-versa.

¶ 34    Once A.E.C. became mobile, Jorge would often take him to parks. Jorge felt that he was the only one who disciplined A.E.C., and he used timeouts as a disciplinary tool. For example, Jorge would sit A.E.C. on his bed, stay there with him while he cried, explain to A.E.C. what he did wrong, and then hug and tell him he loves him. Once A.E.C. turned two years old, Jorge became even more involved with parenting the minor, such as helping to schedule doctor appointments and toilet training him. Jorge always took off work to be at A.E.C.'s doctor appointments, especially the ones at which A.E.C. received shots since Suni does not like needles and did not hold A.E.C. while he was vaccinated.

¶ 35    In May 2016, Jorge and Suni had problems in their relationship and Suni struck Jorge in the back during an argument. Suni then told Jorge that she was going to travel with A.E.C. to California for a week to visit her family to let things cool down. When Suni entered the taxi on the way to the airport, she said she would be back in a month for the rest of her belongings. She then slammed the door and drove off. Jorge called Suni and asked where she and A.E.C. were, but Suni would not tell Jorge and would not allow him to speak with A.E.C. As a result, Jorge did not see or speak with A.E.C. until July 2016. Jorge further testified that in October 2017, he and Suni had additional relationship problems, resulting in Suni preventing him from seeing or speaking with A.E.C. Suni eventually allowed Jorge to see A.E.C. but supervised the time that Jorge spent with him.

¶ 36    Regarding the circumstances under which the parties traveled to California in January 2018, Jorge explained that in December 2017, Suni and he went shopping. Jorge asked Suni to hold his wallet, which contained his CDL and his boss's fuel credit card. Later that day, Jorge asked Suni to return his wallet, but she no longer had it. This resulted in Jorge being fired from his job. Jorge testified that he obtained his CDL in California in 2015 while he was in the Marines. To

obtain a CDL in Illinois, Jorge would have to take all the tests and study for them, which would have been very difficult for him to do. He did not have to take the tests when he obtained the CDL in California because he got a waiver since he drove trucks in the military. Jorge testified that he and Suni discussed traveling to California for the purpose of obtaining a replacement CDL since he could not do so by mail. Suni proposed that they go to California as a family vacation and they could stay for a while and have her parents watch A.E.C. while they found jobs to save money to buy a home in Illinois. According to Jorge, the intended location of the family's "permanent residence" was Illinois, not California, because the cost of living in California is very expensive. Jorge knew that California was cost prohibitive because he had investigated the cost of living while he was stationed at Camp Pendleton in 2015.

¶ 37    Jorge testified that he never entered into a lease agreement in California and never registered his or Suni's vehicles in California. While in California, Jorge and Suni stayed in a camper next to Suni's parents' house. The camper had originally been purchased for the parties to store their belongings. However, after Jorge came home from a job interview one day, Suni had moved them into the camper so that they would not have to be so close to her family. Jorge testified that after the third or fourth day in California, he told Suni that he wanted to return to Illinois. Jorge did not want to live in a camper with no running water or electricity. Suni replied that she never wanted to return to Illinois. Jorge continued to raise the issue of moving back to Illinois, but Suni refused and stated that she and A.E.C. would be staying in California. Jorge did not leave California with A.E.C. because he was fearful of Suni accusing him of kidnapping since there was not yet an official court order granting him parenting time. Jorge was very unhappy staying in California and problems began to develop in his relationship with Suni. Jorge stayed temporarily to work and to save money to move back to Illinois. On May 3, 2018, Jorge returned to the camper

after work and found that Suni's and A.E.C.'s belongings were gone. Jorge called Suni and asked her when he could see A.E.C. Suni replied that she did not know.

¶ 38    Jorge asked Suni for A.E.C.'s medical records several times, but she did not provide them. Suni gave Jorge with the number of the clinic where A.E.C. receives treatment, but he could not obtain records because he was not listed as a parent. Jorge later acknowledged that more recently he video chatted with A.E.C. while at a doctor appointment. Jorge learned that A.E.C. is allergic to dogs and cats on August 3, 2018. Jorge testified that when A.E.C. is exposed to an allergen, he becomes itchy, gets hives, and sneezes often. Jorge testified that if A.E.C. is already sick, he can develop asthma-like symptoms where his throat closes up and he cannot breathe. Jorge is concerned that A.E.C. was still exposed to dogs after the allergy was discovered, and he believes that the exposure will continue if A.E.C. relocates to California. On September 15, 2019, while video conferencing with Suni and A.E.C., Jorge took a video which depicts Suni exposing A.E.C. to dogs. The video was admitted into evidence.

¶ 39    Jorge testified that it would be difficult for him to afford the costs associated with traveling to California from Illinois. Flights range from $250 to $400, and he must pay for car rental and a hotel. Also, Suni lives near the beach, which makes nearby hotels expensive.

¶ 40    The GAL provided an overview of her investigation and recommendation. The GAL testified that she was appointed to help the parties develop a parenting plan and get A.E.C. back to Illinois as had been court ordered. She also testified that there was a question raised as to the propriety of Suni's living arrangements at the time. As a result, a temporary order was entered keeping A.E.C. in Illinois so that the GAL could travel to California to investigate Suni's residence. The GAL found Suni's residence safe and appropriate for the minor. The GAL testified that her responsibilities were expanded after Suni filed the relocation petition. As part of her

investigation, the GAL spoke with various individuals, including the parties, the paternal grandmother, A.E.C.'s psychologist in California, A.E.C.'s social worker in Illinois, and administrators and teachers from A.E.C.'s preschool. In addition, the GAL visited A.E.C.'s daycare facility in California, Suni's home, and Jorge's home. The GAL also reviewed various documents.

¶ 41 The GAL opined that, as with any relocation, "this is a very, very difficult case." The GAL testified that A.E.C. has relatives in both Illinois and California with whom he is very close. Regarding the anticipated impact of relocation on the child, the GAL gave some weight to A.E.C.'s psychologist in California, Dr. Veronica Gutierrez. However, she did not know how long Dr. Gutierrez had been practicing and what professional experience she has. She acknowledged that Dennis Keppler, a licensed social worker in Illinois, found that Jorge can provide adequate emotional support for A.E.C. Regarding A.E.C.'s wishes, the GAL agreed that since A.E.C. was three years old at the time, he does not have a level of maturity required to determine what is in his best interests. The GAL investigated the cost involved with traveling to and from California and found it to be expensive with a roundtrip ticket costing between $250 and $400 and a car rental costing $150. The GAL did not investigate the parties' finances. She did consider allegations of violence between both parties in her written recommendations, but she omitted certain allegations of Suni instigating violence against Jorge and could not specify why she omitted them. The GAL testified that she believes Jorge can provide a safe and stable environment for A.E.C. in Illinois, that Jorge has a strong father-son relationship with A.E.C., and that Jorge will encourage an ongoing relationship between A.E.C. and Suni. The GAL also opined that the schools in the district where Jorge resides in Illinois are better than the schools in the district where Suni resides in California.

¶ 42 Although Jorge established himself as a very devoted, caring, involved father and there was nothing wrong with his parenting skills or his devotion to A.E.C., the GAL recommended that A.E.C. reside with Suni in California subject to frequent and liberal parenting time with Jorge. The GAL's rationale for this recommendation was twofold. First, in the GAL's opinion, the parties had agreed to move to California in January 2018. The GAL noted that both parties left their employment, moved out of their apartment in Illinois, sold their belongings, and took three vehicles with them to California. Although Jorge eventually returned to Illinois, he did so only after the parties' relationship "deteriorated to the point where it was no longer in either of the parties' best interest to continue the relationship." Second, the GAL determined that Suni had been the primary caregiver for most of A.E.C.'s life. The GAL noted that after the minor's birth, Suni stayed home with A.E.C. for approximately eight months. Suni breastfed the minor for over a year, during which time she became very bonded to him. Moreover, every time the parties separated, Suni would take A.E.C. with her. The GAL testified A.E.C.'s psychologist in California indicated that he had an emotional bond with Suni and expressed a preference towards his mother. And while A.E.C.'s social worker in Illinois indicated that Jorge and A.E.C. have an observable emotional bond, he did not relate that A.E.C. expressed a preference toward his father.

¶ 43 The GAL acknowledged that A.E.C. underwent an allergy test on August 14, 2019, which showed that he is allergic to cats and dogs. The allergy test showed that the doctor had given A.E.C. an inhalant and medication, and the test indicated that A.E.C.'s exposure to dogs should be limited "as much as possible." The GAL was aware that Suni has two dogs at her home (owned by her boyfriend), while Jorge does not have a dog in his home. The GAL testified that the dogs do not live in the house and they are being relocated to another home. Knowing that A.E.C. is allergic to dogs, the GAL did not believe it was in A.E.C.'s best interests to have continued

exposure to dogs. Regarding earlier in court when the GAL indicated that she could no longer support her recommendation, the GAL stated that she watched a video that morning of A.E.C. playing with a dog while in Suni's care on September 15, 2019. Suni had told the GAL that the dog was a chihuahua, but the video was played in court, and the GAL acknowledged that the dog looks bigger than a chihuahua. In the video, A.E.C. is holding the dog in his hands and Suni is laughing. After Jorge tells Suni that A.E.C. is allergic to dogs, Suni takes action to separate A.E.C. and the dog. A.E.C. then sneezes. The GAL repeatedly stated that the video caused her concern. She noted, however, that the allergist's report did not list the dog allergy as "imminent danger when exposed to dogs" and concluded that Suni was not placing A.E.C. in immediate harm.

¶ 44 Dennis Keppeler is a licensed clinical social worker and therapist in the Chicago area with 12 years of experience. Beginning in July 2019, Keppeler met with Jorge and A.E.C. seven times. Based on these sessions, Keppeler testified that he was able to assess A.E.C.'s adjustment to his home, school, and community. Keppeler opined that A.E.C. is doing well in his environment with Jorge and demonstrates a good adjustment to his home, his father, and his school in Illinois. Keppeler also observed that Jorge displays good parenting skills with A.E.C. and felt that Jorge is capable of being a strong coparent. Keppeler feels that Jorge is engaged in A.E.C.'s life, attuned to A.E.C.'s needs, and has a selflessness when it comes to A.E.C. that indicates that Jorge would put A.E.C.'s interests first in almost every instance.

¶ 45 Based on his observations, Keppeler believes that A.E.C. has a strong parent-child relationship with Jorge. He believes Jorge is able to provide adequate emotional support for A.E.C., and he has no concerns about Jorge's ability to be A.E.C.'s primary caregiver. Keppeler observed Jorge and A.E.C. converse about their activities, consistent bedtimes, rules, and getting an appropriate amount of sleep. He has also seen Jorge provide validation, empathy, and limit

setting for A.E.C. Keppeler believes that Jorge could provide a nurturing, consistent, and stable environment for A.E.C. in Illinois. Keppeler reviewed the video of A.E.C. playing with a dog while in Suni's care. Keppeler opined that Suni was not taking the concerns about A.E.C.'s allergies seriously.

¶ 46    Marilyn Roa is the director of the KinderCare daycare facility that A.E.C. attends in Addison, Illinois. Roa has a bachelor's degree in education and has been working with children for 15 years. She has known A.E.C. and his family for 2½ years and has had an opportunity to observe the interaction between A.E.C. and Jorge. Based on her observations, Roa believes A.E.C. has a strong relationship and attachment to Jorge. Roa testified that A.E.C. is excited when Jorge picks him up from the daycare. Furthermore, Roa has observed Jorge and A.E.C. do activities after school such as getting ice cream across the street from the daycare center. Roa asked Jorge to bring in a family picture for a family tree in A.E.C.'s classroom. Jorge brought in a picture of himself, Suni, and A.E.C. together so that A.E.C. can see both of his parents on the family tree.

¶ 47    Roa also has observed interactions between A.E.C. and his extended family in Illinois. Roa testified that A.E.C's grandmother and aunt are very involved in his life. She recounted that when the daycare center has an event, A.E.C.'s grandmother and aunt are there. Roa also testified that A.E.C. has developed friendships and connections with his classmates. A.E.C. is always hugging his friends when he gets to class. When A.E.C. is absent, the other children ask for him. Moreover, A.E.C. has great relationships with the teachers. Roa noted that A.E.C.'s teachers referred him to Medinah Primary School for speech therapy because of stuttering. Medinah has a program that will help A.E.C. with his speech and provide reading and communication services that the teachers at KinderCare cannot provide. The program will integrate all his academics and his speech. Overall, Roa believes that A.E.C. has everything in his current environment that he needs to be

successful.

¶ 48    Roa believes that consistency is key in a child's life because when a child has consistency, the child learns better and has better relationships with other children and adults. Based on her observations, Roa believes that Jorge can provide a consistent and stable environment for A.E.C. For example, during pickup time, Jorge stays in the classroom with A.E.C. and asks about his day. Jorge also takes the time to listen to A.E.C., which Roa does not observe many other parents doing. Roa also testified that A.E.C. often talks about Jorge in class. Roa testified that her interactions with Suni have been limited. Roa has observed Suni pick up A.E.C. from the facility. Further, in the summer of 2017, Roa had a conversation with Suni during which Suni expressed that she wanted to limit or restrict Jorge from picking up A.E.C. from daycare. Roa told Suni that she could not do that absent a court order. Ultimately, Roa opined that it would not be in A.E.C.'s best interests to relocate to California given the support system and services available to him in Illinois.

¶ 49    Heather Crawford is "in management" at the KinderCare facility A.E.C. attends in Addison. Crawford has a bachelor's degree in early childhood education and has worked in her field for 13 years. Crawford has known A.E.C. and his parents for 2½ years. Crawford testified that when Jorge picks up A.E.C. from daycare both A.E.C.'s and Jorge's faces "light[] up." Jorge gives A.E.C. his undivided attention while they talk about what they will do that afternoon. Crawford also sees a lot of Jorge's extended family at the daycare and noted that A.E.C. talks about his grandmother, his aunt, and his cousins in Illinois. Based on her observations, Crawford believes A.E.C. has a strong relationship and attachment to Jorge and his extended family in Illinois. Crawford has also observed A.E.C. develop friendships and connections to the children and staff at KinderCare. Crawford noted that A.E.C. recently moved up to a new classroom. A.E.C. has two teachers in his new classroom, and he has gotten along very well with them and the other

children in the classroom.

¶ 50    Crawford believes Jorge can provide a consistent, stable, and safe environment for A.E.C. Crawford testified that A.E.C. always has what he needs and is always clean. Further, Jorge always wants to put him in extracurricular activities. Jorge enrolled A.E.C. at Medinah based on the recommendations of A.E.C.'s KinderCare teachers so that A.E.C. could get the resources needed for his speech. Crawford believes that A.E.C. has consistency in Illinois with school, daycare, friends, and family, which she knows is a huge support system for him. She is concerned that relocating A.E.C. to California would "turn his whole world upside down."

¶ 51    Vienna Peterson is A.E.C.'s paternal grandmother. Peterson lives in Addison. Peterson was present for A.E.C.'s birth in Illinois. Jorge and Suni lived in Peterson's home for two periods of time, once in 2015 when Suni was pregnant with A.E.C. and once in 2016 when A.E.C. was about six months old. Peterson testified that while on maternity leave, Suni would take care of A.E.C. all day. When Jorge came home, Suni would prepare something to eat while Jorge held A.E.C.

¶ 52    At the time of trial, Peterson was spending time with A.E.C. every weekday morning from the time he wakes up until he goes to daycare. Peterson and A.E.C. eat breakfast together, brush their teeth, and get ready for school and work. Peterson believes she has an amazing relationship with A.E.C. and that A.E.C. has an important attachment to her and her extended family in Illinois. Peterson calls A.E.C. her "noodle" and anytime she sees him or goes to his house, she will say "my noodle," and A.E.C. will run up and hug her. A.E.C. kisses her and tells her that he loves her.

¶ 53    Peterson testified regarding A.E.C.'s interactions with other members of his extended family in Illinois. Peterson's husband (A.E.C.'s paternal grandfather) loves A.E.C. very much and runs around with him on the playground. A.E.C.'s grandfather bought A.E.C. his first bicycle, and Jorge taught A.E.C. how to ride it. Peterson's daughter, Monica, also has a very close relationship

with A.E.C. and he loves being with her. Monica has four children of her own that A.E.C. interacts with often, and he gets excited about spending time with them.

¶ 54    Peterson believes Jorge has an amazing relationship with A.E.C. and that they love each other very much. Peterson described Jorge as a proud father who ensures that A.E.C.'s needs are met before Jorge's own needs. Peterson also testified that Jorge provides a clear and consistent schedule for A.E.C. Peterson testified that Jorge helped change A.E.C.'s diapers, bathed him, and potty trained him. Peterson believes that Jorge can provide a safe and stable environment for A.E.C. Peterson testified to numerous photos that were admitted into evidence showing the interaction between A.E.C., Jorge, and the extended family in Illinois.

¶ 55    Opining that in May 2016, Suni took A.E.C. to California with no intention of returning, Peterson does not believe that Suni will facilitate and encourage a close relationship between A.E.C. and Jorge. Peterson acknowledged that Suni did return to Illinois in July 2016. However, during Suni's absence, Peterson and her family were unable to interact with A.E.C. Peterson testified that if Jorge's and Suni's relationship was in trouble, Suni would not permit Jorge or the extended family to interact with A.E.C.  In contrast, Peterson believes that Jorge would encourage a relationship between A.E.C. and Suni. Peterson did not believe that it is in A.E.C.'s best interest to relocate to California. Peterson fears that relocation will erode the relationship that Jorge and A.E.C. have.

¶ 56    Peterson noted that the GAL did not ask her about extended family in Illinois and did not meet or speak with Peterson's husband, Monica, Gabby or Cindy (Peterson's other daughters), or A.E.C.'s cousins in Illinois.  Peterson tried to relay information to the GAL regarding this case, but at times, the GAL was resistant to these attempts.

¶ 57    Peterson acknowledged that Jorge and Suni moved to California. She testified that when

they were leaving, Jorge told her that they were having financial difficulties and that Suni's parents would help watch A.E.C. while Suni and Jorge could work to save money and get back on their feet. It was Peterson's understanding that they did not intend to stay in California because it was so expensive. Jorge told Peterson that he wanted to purchase a home in Illinois. Although Jorge wanted to come live with Peterson, Suni was against the idea.

¶ 58   Monica Carillo, Jorge's sister, testified that she has known A.E.C. since the day he was born and was present at his birth. Monica testified that she has a "very strong" relationship with A.E.C. and sees him almost every week. In addition, Monica regularly video chats with him and occasionally picks him up from school. Monica testified that A.E.C. loves her four children and is very close with them. Monica testified to numerous photos that were admitted into evidence showing the interaction between A.E.C., Monica, and Monica's children.

¶ 59   Monica testified that A.E.C. and Jorge spend a lot of time together and have a close relationship. Monica described Jorge as a "very consistent parent" who provides "a lot of stability." Monica is available to assist Jorge with anything he needs to raise A.E.C. Monica stated that A.E.C. is very close with his paternal grandparents in Illinois, and they spend a lot of time together. Monica testified that the GAL never reached out to her to discuss her relationship with A.E.C. or the relationship A.E.C. has with his extended family in Illinois.

¶ 60   Monica further testified that although Suni could be "distracted at times," overall she is a "super great mom, super caring." Nevertheless, Monica did not believe that Suni would facilitate or encourage a relationship between Jorge and A.E.C. Monica recalled that when Jorge's and Suni's relationship would get "rocky," Suni would isolate A.E.C. from Jorge and his extended family in Illinois. In contrast, Monica believes that Jorge would encourage a relationship between A.E.C. and Suni because he facilitates frequent phone contact with her when it is not her parenting

time and he has told Monica how important it is for A.E.C. to have his mother in his life. Monica did not believe that relocating A.E.C. to California would enhance the minor's life because he has so much stability and consistency in Illinois with being enrolled in school, KinderCare, speech therapy, and other therapy. Jorge takes all of those activities seriously, is very consistent with A.E.C.'s schedule, and provides a clean and stable home for A.E.C.

¶ 61 Monica testified that in November 2018, Suni approached her about moving into Monica's house so that she and Jorge could "save money and get back on their feet." Monica told Suni that her home was too small for two families. Suni later told Monica that she wanted to move to California to save money on KinderCare because her mother would be able to watch A.E.C. all day. However, according to Monica, Jorge's and Suni's long-term plans had always been to stay in the Chicago area.

¶ 62 In rebuttal, Suni testified about the incidents of May 2016 and October 2017, arguing that she felt threatened and left based on the advice of police officers. Regarding the events in May 2018, Suni testified that she filed a restraining order in California against Jorge. According to Suni, the judge in California denied her request to allow Jorge visits with A.E.C. until he appeared in court. That is why Jorge did not have contact with A.E.C. during that time. Jorge then testified in rebuttal and denied the allegations Suni made in her rebuttal. He also testified that he appeared in California on May 23, 2018, for the restraining order, but Suni did not appear, so the charges were dropped without prejudice.

¶ 63 On October 11, 2019, after considering the evidence and testimony presented at the relocation hearing and in conjunction with the statutory factors for removal set forth in section 609.2(g) of the Act (750 ILCS 5/609.2(g) (West 2018)), the trial court entered an order granting Suni's relocation petition. The order allocated parenting time to Jorge as follows: (1) at least two

weekends per month in California (or two other consecutive nights with 30 days' written notice to Suni); (2) five consecutive weeks in Illinois during the summer; (3) seven days for Thanksgiving in Illinois in even years; and (4) one week of winter vacation in Illinois, alternating between Christmas and New Year's Day. The order requires Jorge to pay for the transportation costs associated with exercising his parenting time. The court assigned sole responsibility for making routine decisions and emergency decisions affecting the minor's health and safety to the parent then exercising parenting time. However, "major decisions" concerning the minor's education, medical needs, religion, extracurricular activities, childcare, and summer camp were required to be made jointly. The order also provides that each party shall have the right to make reasonable electronic or telephonic contact with the minor with the knowledge and consent of the other parent. The court stated that the fact that the parties have engaged in electronic communication with the child during the litigation and both indicated that they would continue to do so, was a factor in allowing the relocation to California. The court ordered Jorge to pay child support to Suni. The court calculated the statutory support obligation at $349.18 per month. However, considering that Jorge will incur substantial travel expenses in exercising his parenting time, the court deviated from the statutory amount and ordered Jorge to pay $100 per month in child support. Finally, the court ordered the parties to evenly split any uncovered expenses for medical, daycare, and extracurricular activities. Jorge filed a notice of appeal from the trial court's order.

¶ 64                                          III.  ANALYSIS

¶ 65    At the outset, we note that Suni has not filed an appellee's brief. In such circumstances, the reviewing court has three options: (1) if justice so requires, actively seek bases for sustaining the judgment of the trial court; (2) when the record and issues are simple, decide the case on the merits; or (3) reverse when the appellant's brief shows *prima facie* error. *First Capitol Mortgage*

*Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976). While it is not our duty to serve as an advocate for respondent, we find that the interests of justice dictate that we should determine the merits of the appeal as the welfare of a child is at stake. *In re Marriage of Kutinac*, 182 Ill. App. 3d 377, 379 (1989).

¶ 66    The arguments Jorge raises on appeal can be divided into three categories. First, Jorge argues that the trial court erred in denying his motion to dismiss Suni's relocation petition because: (1) Suni had not been allocated either a majority of parenting time or equal parenting time, which are statutory requirements for filing a relocation petition (750 ILCS 5/609.2(b) (West 2018)); (2) Suni failed to comply with the statutory notice requirements for filing a relocation petition (750 ILCS 5/609.2(c), (d) (West 2018)); and (3) Suni failed to respond to his motion to dismiss, thereby deeming the allegations therein admitted. Second, Jorge asserts that the trial court erred in allowing Suni to proceed on her relocation petition because "she had not filed any other pleading seeking allocation of parental responsibilities." Finally, Jorge contends that the trial court's decision to grant Suni's petition to relocate to California with the minor was against the manifest weight of the evidence.

¶ 67                          A.  Motion to Dismiss

¶ 68    Jorge argues that the trial court erred, as a matter of law, in denying his motion to dismiss Suni's Petition to Relocate because: (1) Suni was not allocated with either a majority of parenting time or equal parenting time, which is an explicit statutory requirement for filing a relocation petition (750 ILCS 5/609.2(b) (West 2018)); (2) Suni failed to comply with the notice requirements of the relocation statute (750 ILCS 5/609.2(c), (d) (West 2018)); and (3) Suni did not file a response or counteraffidavit to the motion to dismiss or present any contrary evidence at the hearing on the motion, thereby deeming the allegations in the motion admitted.

¶ 69    Jorge moved for dismissal of Suni's relocation petition pursuant to section 2-619(a)(9) of the Code (735 ILCS 5/619(a)(9) (West 2018)). Under that section, the movant admits the legal sufficiency of the claim but asserts that an affirmative matter appearing on the face of the pleading defeats or avoids the effect of the claim. *McIntosh v. Walgreens Boots Alliance, Inc.*, 2019 IL 123626, ¶ 16. "Affirmative matter" is "something in the nature of a defense which negates the cause of action completely or refutes crucial conclusions of law or conclusions of material fact contained in or inferred from the complaint." *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 486 (1994). Unless the affirmative matter is already apparent on the face of the complaint, the moving party must support the affirmative matter with an affidavit or some other material that could be used to support a motion for summary judgment. *Andrews v. Marriott International, Inc.*, 2016 IL App (1st) 122731, ¶ 19. Once the moving party has presented adequate affidavits or other evidence of support, he or she has satisfied the initial burden of going forward on the motion. *Andrews*, 2016 IL App (1st) 122731, ¶ 19. At that point, the burden shifts to the opposing party, who is required to establish that the affirmative matter is either unfounded or involves an issue of material fact. *Andrews*, 2016 IL App (1st) 122731, ¶ 19. The opposing party may overcome this burden by presenting "affidavits or other proofs." 735 ILCS 5/2-619(a)(9) (West 2018); *Andrews*, 2016 IL App (1st) 122731, ¶ 19. If the opposing party does not come forward with a counteraffidavit or other evidence refuting the evidentiary facts in the moving party's affidavit, those facts may be deemed admitted and the motion may be granted on the basis that the opposing party "failed to carry the shifted burden going forward." *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 116 (1993). We review *de novo* an appeal from a trial court order granting or denying a section 2-619 dismissal. *In re Marriage of Morreale*, 351 Ill. App. 3d 238, 240 (2004). Moreover, we may affirm the trial court's decision on any basis supported by the record, regardless of the

reasoning employed by the trial court. *Morreale*, 351 Ill. App. 3d at 241.

¶ 70                                    1. Allocation of Parenting Time

¶ 71    Jorge first argues that the trial court erred in denying his motion to dismiss because Suni did not satisfy one of the statutory requirements for filing a relocation petition, *i.e.*, that she have the majority of parenting time or equal parenting time. 750 ILCS 5/609.2(b) (West 2018).

¶ 72    Relocation is governed by section 609.2 of the Act (750 ILCS 5/609.2 (West 2018)). That section provides that "[a] parent who has been allocated a majority of parenting time or either parent who has been allocated equal parenting time may seek to relocate with a child." 750 ILCS 5/609.2(b) (West 2018). In her relocation petition, Suni indicated that she had "[t]he same amount of parenting time as [Jorge]." Asserting that the April 4, 2019, temporary agreed order provided him with the majority of parenting time, Jorge asserts that "Suni cannot possibly have a majority of parenting time or equal parenting time" and therefore "cannot seek to relocate with A.E.C. per the plain language of the statute." However, Jorge's claim that Suni cannot properly seek relocation is premised on a faulty interpretation of what the April 4, 2019, temporary agreed order accomplished.

¶ 73    In support of his position, Jorge emphasizes passages from the April 4, 2019, temporary agreed order providing that he is "designated as the parent with the majority of the parenting time with the minor child for purposes of Section 750 ILCS 5/606.10" and that he "[t]emporarily *** has the sole parental responsibilities of the minor child." Section 606.10 of the Act (750 ILCS 5/606.10 (West 2018)) is titled "Designation of custodian for purposes of other statutes" and provides as follows:

> "*Solely for the purposes of all State and federal statutes that require a designation or determination of custody or a custodian*, a parenting plan shall designate the parent who is

allocated the majority of parenting time. This designation shall not affect parents' rights and responsibilities under the parenting plan. For purposes of Section 10-20.12b of the School Code only, the parent with the majority of parenting time is considered to have legal custody." (Emphasis added.) 750 ILCS 5/606.10 (West 2018).

As the plain language of section 606.10 indicates, it applies only to "statutes which require a designation or determination of custody." We read nothing in the relocation statute that requires a designation or determination of custody. Moreover, the April 4, 2019, temporary agreed order did not otherwise expressly allocate a majority of parenting time to either parent. Instead, the order provides that Jorge "shall have parenting time with the minor child at all times not specifically designated as SUNI'S parenting time" and, acknowledging that Suni resides in California "which for practical purposes limits her ability to enjoy an expanded parenting schedule," provides that Suni "shall enjoy parenting time with the minor" on "[w]eekends that the parties mutually agree upon in writing" and "any other time the parties mutually agree upon in writing." Thus, the fact that the April 4, 2019, temporary agreed order "designated" Jorge as the parent with the majority of parenting time for purposes of section 606.10 and granted him temporary sole parental responsibilities for the child did not restrict Suni from filing a relocation petition.

¶ 74    In addition, the record reflects that from the date of A.E.C.'s birth through the date Suni filed her relocation petition, Suni had at least equal, if not a majority, of the parenting time with the minor. Suni filed her relocation petition in May 2019, when A.E.C. was about 3½ years old. At that time, the parties did not have a formal parenting plan. Jorge notes that at trial, Suni testified that she did not have the majority of parenting time or equal parenting time when she filed the petition to relocate.  However, the trial court found that the minor had resided with Suni a majority of his life. The evidence of record supports this finding. In this regard, the evidence shows that the

parties jointly raised the minor from the date of his birth until May 2018 when Jorge returned to Illinois from California. Thereafter, Suni became the primary parent until late December 2018, when the parties began alternating parenting time in three-week intervals. This arrangement continued until February 2019, when Jorge filed an emergency motion for A.E.C. to remain in Illinois due to concerns about Suni's living arrangements with the minor in California. The trial court granted Jorge's emergency motion and ordered that the minor remain in Illinois until the GAL had an opportunity to complete her investigation and that Suni exercise her parenting time in Illinois. After that, the minor spent significant time in Illinois with Jorge until June 17, 2019, when the parties again began alternating parenting time with the minor between California and Illinois. As this record suggests, both parents were substantially involved in the minor's life and, except for the period during which the GAL was investigating Suni's living arrangements, it was the practice of the parties to equally share parenting time. Accordingly, we reject Jorge's argument that the trial court erred in denying his motion to dismiss Suni's relocation petition on the ground that she failed to satisfy the minimum parenting time requirement in section 609.2(b) of the Act.

¶ 75                                    2. Notice

¶ 76    Jorge also argues that the trial court erred in denying his motion to dismiss because Suni failed to satisfy the notice requirements applicable to a relocation petition and she failed to provide any legitimate excuse as to why such statutorily-required notice was impracticable.

¶ 77    Section 609.2(c) of the Act requires a parent intending to relocate to provide written notice of the relocation to the other parent. 750 ILCS 5/609.2(c) (West 2018). The notice "must provide at least 60 days' written notice before the relocation unless such notice is impracticable (in which case written notice shall be given at the earliest date practicable) or unless otherwise ordered by the court." 750 ILCS 5/609.2(d) (West 2018). At a minimum, the notice must set forth: (1) the

intended date of the parent's relocation; (2) the address of the parent's intended new residence, if known; and (3) the length of time the relocation will last, if the relocation is not for an indefinite or permanent period. 750 ILCS 5/609.2(d) (West 2018). If the non-relocating parent objects to the relocation, the parent seeking relocation must file a petition seeking permission to relocate. 750 ILCS 5/609.2(f) (West 2018).

¶ 78    In this case, Suni filed written notice of her intent to relocate on May 9, 2019. In the notice, Suni indicated that she planned to relocate permanently to California with A.E.C. on May 14, 2019. Suni specified in the notice of relocation her address in California and proposed changes to the parenting plan. Also on May 9, 2019, Suni filed her relocation petition. In the relocation petition, Suni acknowledged that the notice she provided Jorge was less than 60 days prior to her planned move. Suni explained that she was unable to give the statutorily-required notice because she "was previously represented by counsel, who did not enter the relocation request [she] had requested." Suni stated that she is filing the petition on her own behalf as she had begun representing herself. The hearing on Suni's petition commenced on September 19, 2019, and the trial court issued its decision granting Suni's petition on October 11, 2019.

¶ 79    As noted, Jorge argues that the trial court erred in denying his motion to dismiss because Suni failed to satisfy the notice requirements applicable to a relocation petition and she failed to provide any legitimate excuse as to why such statutorily required notice was impracticable. Jorge emphasizes that Suni indicated in her notice of relocation that she planned to relocate permanently to California with A.E.C. only five days after filing the notice of relocation. However, Jorge does not allege that Suni actually relocated to California with the minor on May 14, 2019. Indeed, Jorge acknowledged at the hearing on his motion to dismiss that Suni was living in California *without* the minor. Nevertheless, Jorge insists that because Suni failed to comply with the plain language

of the notice requirement of section 609.2, her relocation petition should have been dismissed. We disagree. As the foregoing record makes clear, the entire process from when Suni initiated the relocation process to when her relocation petition was granted lasted well over 60 days. Thus, while Suni did not strictly comply with the notice requirement of section 609.2 of the Act, Jorge had actual notice that Suni sought to relocate with A.E.C. more than 60 days before the court granted her relocation petition. We also observe that the failure to comply with the notice requirements of section 609.2 is simply a factor that the court may consider when deciding whether a relocation is being made in good faith. 750 ILCS 5/609.2(d) (West 2018). Jorge does not cite any authority to support the implication that the failure to give notice prohibits the court from considering a relocation petition, and our research has revealed no such authority. Accordingly, we reject Jorge's claim that the trial court erred in denying his motion to dismiss Suni's relocation petition on the ground that she failed to satisfy the notice requirement in section 609.2 of the Act.

¶ 80                                    3. Response

¶ 81     Next, Jorge argues that Suni's failure to file a response or counteraffidavit to his motion to dismiss and her failure to present any contrary evidence at the hearing on his motion to dismiss required the allegations in the motion to be deemed admitted. Jorge has forfeited consideration of this issue by failing to raise it either at the hearing on his motion to dismiss or as one of the affirmative defenses asserted in his response to Suni's relocation petition. See *In re Marriage of Wolff*, 355 Ill. App. 3d 403, 415 (2005) (holding that petitioner waived issue that respondent's failure to reply to affirmative defenses in response to amended motion to reconsider resulted in those matters being deemed admitted where petitioner did not bring issue to the attention of the trial court and fully litigated the issues contained in the affirmative defenses); *Buckner v. O'Brien*, 287 Ill. App. 3d 173, 177 (1997) (noting that a party may not raise an issue on appeal that was not

raised in the trial court).

¶ 82                              B. Other Pleading

¶ 83    Next, Jorge notes that if a justiciable issue is not presented through proper pleadings, a court cannot *sua sponte* adjudicate an issue.  See *In re Custody of Ayala*, 344 Ill. App. 3d 574, 584 (2003). Jorge therefore asserts that the trial court "erred in finding that Suni had right [*sic*] to proceed further as she had not filed any other pleading seeking allocation of parental responsibilities." Jorge's argument is unclear. It is apparently a reference to comments made by the trial court at the hearing on his motion to dismiss Suni's relocation petition.  After the trial court denied Jorge's motion, his attorney moved for a finding pursuant to Illinois Supreme Court Rule 304(a) (eff. March 8, 2016) (requiring a special finding to appeal judgments as to fewer than all parties or claims). The trial court denied the request, stating "I don't find it to be a pertinent issue, because I think both parties have the right to present their issues." Jorge now asserts that "Suni had no pleading seeking allocation of parental responsibilities or even a response to [his] petitions seeking same," so "the trial court had no authority to rule that Suni has 'a right to present her issues.' " We disagree.  First, Suni did file a response to Jorge's parentage petition on October 12, 2018. Second, Suni did have a pleading before the trial court—her relocation petition which the trial court declined to dismiss on Jorge's motion. Moreover, not only was the allocation issue before the court because of Jorge's "petitions seeking same," but in the relocation petition, Suni proposed that the parties "share 50/50 legal custody," she have the minor "during the school year and every school day," and Jorge have the minor on certain holidays and for periods of time when the minor is not in school. Considering this record, Jorge's claim the trial court erred in allowing Suni to proceed on her relocation petition is wholly unpersuasive.

¶ 84                              C.  Petition to Relocate

¶ 85    As his final assignment of error, Jorge argues that the trial court erred in granting Suni's relocation petition. Section 609.2 of the Act (750 ILCS 5/609.2 (West 2018)) sets forth the factors a court must consider when ruling on a petition to relocate. Pursuant to section 609.2, the trial court must decide whether relocation is appropriate based upon the best interests of the minor in light of the following 11 factors: "(1) the circumstances and reasons for the intended relocation; (2) the reasons, if any, why a parent is objecting to the intended relocation; (3) the history and quality of each parent's relationship with the child and specifically whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment; (4) the educational opportunities for the child at the existing location and at the proposed new location; (5) the presence or absence of extended family at the existing location and at the proposed new location; (6) the anticipated impact of the relocation on the child; (7) whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs; (8) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to relocation; (9) possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child; (10) minimization of the impairment to a parent-child relationship caused by a parent's relocation; and (11) any other relevant factors bearing on the child's best interests." 750 ILCS 5/609.2(g) (West 2018).

¶ 86    The party seeking judicial approval of the proposed relocation must establish by a preponderance of the evidence that the relocation is in the minor's best interests. *In re Marriage of Kavchak*, 2018 IL App (2d) 170853. In deciding whether relocation is in the minor's best interests, a trial court should hear "any and all relevant evidence." *In re Marriage of Eckert*, 119

Ill. 2d 316, 326 (1988). A determination of the minor's best interests cannot be reduced to a simple bright-line test but must be made on a case-by-case basis, depending upon the circumstances of each case. *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 32; *Eckert*, 119 Ill. 2d at 326. An appellate court reviews the trial court's decision deferentially and does not reweigh the competing considerations. As our supreme court has stated " '[t]he presumption in favor of the result reached by the trial court is always strong and compelling in this type of case.' " *Eckert*, 119 Ill. 2d at 330 (quoting *Gallagher v. Gallagher*, 60 Ill. App. 3d 26, 31-32 (1978)); see also *In re P.D.*, 2017 Ill. 2d 170355, ¶ 18. Such deference is appropriate because the trier of fact has significant opportunities to observe both the parents and, if applicable, the children, and therefore it is able to assess and evaluate their temperaments, personalities, and capabilities. *Eckert*, 119 Ill. 2d at 330. Accordingly, a trial court's determination of what is in the best interests of a child should not be reversed unless it is against the manifest weight of the evidence. *Eckert*, 119 Ill. 2d at 328. A court's decision is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent or where its findings are unreasonable, arbitrary, or not based on the evidence presented. *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

¶ 87    The record in this case establishes that the trial court conducted a thorough hearing and heard extensive testimony from Suni, Jorge, the GAL, and several other witnesses regarding the proposed relocation. In granting Suni's relocation petition, the court applied the statutory factors in section 609.2(g) of the Act (750 ILCS 5/609.2(g) (West 2018)). Notably, the court found that the parties' move to California in January 2018 "was not temporary and not solely for Jorge to replace his [CDL]." The court observed that the parties sold their personal items, drove three cars to California, and had no place to live in Illinois. It was only after the parties' relationship "soured" that Jorge returned to Illinois and filed a parentage action. The court found that both Suni and Jorge

had a positive relationship with A.E.C., the schools in Illinois were ranked "slightly higher" than those in California, Suni's extended family resided in California, and Jorge's extended family resided in Illinois. The court determined that while the impact of relocation upon the minor would be minimal due to his young age and the number of places where he has lived, traveling between California and Illinois "could be problematic" for a young child. As a result, the court noted that most of the expense would be on Jorge, who would have to fly to California to exercise parenting time. The evidence presented at trial showed that the cost of a round-trip ticket between Illinois and California was between $250 and $400 and car rental was about $150. In addition, Jorge would incur hotel expenses. The court acknowledged that exercising parenting time would be "burdensome" given the vast distance between California and Illinois and the parties' limited financial means. The court noted that because the distance and costs involved in traveling between California and Illinois would limit the frequency of parenting time, video conferencing would be the only option of maintaining contact. The court noted that while video conferencing did not adequately replace physical contact between a child and parent, it was better than no parent. Based on the foregoing, the court granted Suni's relocation petition. After reviewing the record, and considering the deferential standard of review applicable to relocation proceedings, we are unable to conclude that the trial court's judgment was against the manifest weight of the evidence.

¶ 88    Nevertheless, Jorge presents various reasons why, in his opinion, the trial court's decision to grant Suni's relocation petition was against the manifest weight of the evidence. Jorge's assertions can be categorized as follows: (1) the trial court "placed almost all its emphasis on the disputed facts of whether the parties intended to relocate to California"; (2) the allocation of parenting time set forth in the trial court's order sets up Jorge "to fail since he will be financially unable to exercise all of the parenting [time] allotted to him"; (3) the trial court minimized his

concerns about A.E.C.'s allergies; and (4) the GAL failed to adequately explore A.E.C.'s relationship with his extended family in Illinois. We address each argument in turn.

¶ 89    Jorge first claims that the trial court "placed almost all its emphasis on the disputed facts of whether the parties intended to relocate to California." We disagree. The trial court considered whether the parties intended to move permanently to California in conjunction with the first statutory relocation factor, *i.e.*, the circumstances and reasons for the intended relocation. We find no indication that the trial court weighed this factor more heavily than any other statutory factor and Jorge does not explain why he believes this is the case. Nevertheless, we point out that, depending on the circumstances, some factors may weigh more heavily than others. *In re P.D.*, 2017 IL App (2d) 170355, ¶ 49. Thus, even if the trial court had weighed this factor more heavily than the other statutory factors, it would not have been improper.

¶ 90    In a related argument, Jorge disputes the trial court's finding that the parties intended to relocate to California permanently. However, the parties' testimony regarding their intent when they traveled to California in January 2018 was conflicting. Suni testified that she and Jorge moved to California in January 2018 when their apartment lease in Illinois expired. Suni explained that Jorge drove to California first because he was not able to renew his California-issued CDL in Illinois. Later that month, Suni and A.E.C. flew out to California. Suni and Jorge then returned to Illinois (leaving A.E.C. with Suni's parents) to clean out their apartment, dispose of their belongings, and drive their other two cars to California. Suni further testified that Jorge renewed his CDL in California and found employment at a furniture store. Suni also found employment at a staffing agency. Jorge testified that he and Suni traveled to California in January 2018 to obtain a replacement CDL, to vacation, to visit Suni's family, and to save money to purchase a home in Illinois. Jorge testified that the intended location of the family's "permanent residence" was always

Illinois because the cost of living in California is so expensive. Jorge noted that he never entered into a lease in California and that the parties never registered their vehicles in California.

¶ 91    The court also heard testimony from the GAL, Peterson, and Monica regarding the parties' intent when they went to California in January 2018. The GAL opined that the parties agreed to move to California, noting that they left their employment in Illinois, moved out of their apartment, sold their belongings, and took three vehicles with them. The GAL admitted that Jorge eventually returned to Illinois, but did so only after the parties' relationship "deteriorated to the point where it was no longer in either of the parties' best interests to continue the relationship." Peterson acknowledged that the parties moved to California, but testified that it was her "understanding" that the move was temporary to allow Jorge and Suni to save money and become financially stable. According to Monica, Jorge's and Suni's long-term plans had always been to stay in the Chicago area. Assessing the credibility of witnesses and resolving conflicts in the evidence are matters for the trial court, as the trier of fact. *In re Marriage of Vondra*, 2016 IL App (1st) 150793, ¶ 18. Further, the number of witnesses testifying for one side or the other is not dispositive. *People v. Manning*, 371 Ill. App. 3d 457, 465; *Thornton v. Rhodus Mobile Homes, Inc.*, 104 Ill. App. 3d 869, 872 (1982). Under the manifest-weight-of-the-evidence standard, it is not our function to reweigh the evidence or assess the credibility of the testimony. *In re Marriage of Pfeiffer*, 237 Ill. App. 3d 510, 513(1992). Nor may we set aside the trial court's determination on a factual issue merely because a different conclusion could have been drawn from the evidence. *Pfeiffer*, 237 Ill. App. 3d at 513. Considering the conflicting testimony regarding the parties' intent, the trial court's finding that the parties' move to California in January 2018 was intended to be permanent was a reasonable conclusion based on the evidence of record.

¶ 92    Jorge next argues that the allocation of parenting time set forth in the trial court's order sets

him up "to fail since he will be financially unable to exercise all of the parenting [time] allotted to him." Jorge notes that the trial court found that his net income is only $1689 per month or $20,268 per year. Yet a single visit to California to exercise his parenting time would cost between $450 and $600 exclusive of hotel expenses. Jorge argues that given these costs, he would be unable to see A.E.C. on a regular basis and the trial court therefore failed to fashion "a reasonable or even realistic allocation of parenting time." Jorge cites *Shinall v. Carter*, 2012 IL App (3d) 110302, in support of his claim that the trial court's parenting time schedule was unreasonable. However, as noted above, the determination whether to grant a relocation petition must be made on a case-by-case basis depending on the circumstances of each case. *Fatkin*, 2019 IL 123602, ¶ 32; *Eckert*, 119 Ill. 2d at 326. As one court has noted, "rarely will the facts and circumstances in two separate [relocation] cases be comparable." *In re Marriage of Johnson*, 352 Ill. App. 3d 605, 616 (2004). Indeed, *Shinall* provides negligible assistance in reviewing the trial court's decision because there are noteworthy factual differences between that case and this one.

¶ 93    In *Shinall*, the custodial parent wanted to relocate with the minor, a three-year old child, from Illinois to Colorado to live with her new spouse. *Shinall*, 2012 IL App (3d) 110302, ¶ 3. The court stated that "the custodial parent must prove more than his or her own desire to live with a new spouse" to support a relocation petition. *Shinall*, 2012 IL App (3d) 110302, ¶ 47. Moreover, the court found that the visitation schedule established by the trial court would require the minor to travel to Illinois six times a year, meaning that she would be required to take 12 flights a year or travel in a car for 15 hours each way. The present case does not have comparable facts. Suni is not relocating to California out of a desire to live with a new spouse, and the burden of travel does not fall principally upon A.E.C.

¶ 94    Moreover, while Jorge is concerned that he will not be able to exercise all of the parenting

time allocated to him because of the cost and distance between Illinois and California, which is a legitimate concern, we note that any relocation necessarily impacts parenting time. Indeed, the trial court recognized that the vast distance between Illinois and California as well as the costs involved in traveling between the two states does not promote parenting time. The trial court mitigated these concerns by reducing Jorge's child-support obligation to offset the travel costs, awarding Jorge extended periods of parenting time in the summer, at Thanksgiving, and during winter vacation, providing Jorge with the flexibility to choose when to exercise his parenting time in California (as long as he provides Suni with 30 days' written notice), and granting each party the right to make reasonable electronic or telephonic contact with the minor. And while we are not unsympathetic to Jorge's concern that he will not be able to have parenting time as frequently as that ordered by the trial court, the measures in place support Jorge's ability to maintain his relationship with A.E.C.

¶ 95 Third, Jorge insists that the trial court minimized his concerns about A.E.C.'s allergies. We disagree. The court was keenly aware that A.E.C. is allergic to dogs as it repeatedly referenced this fact in its October 11, 2019, order. For instance, the court specifically noted Jorge's concern that Suni did not properly keep dogs away from A.E.C. after he was diagnosed in 2019. The court noted, however, that the severity of the allergy was not disclosed, the allergy was not life-threatening as A.E.C. has not been hospitalized as a result of his exposure to dogs, and Suni had taken steps to remove the dogs from her parent's home so as to minimize A.E.C.'s exposure to dogs. The evidence presented at the relocation hearing supports these findings, and we find the trial court gave Jorge's concern the weight to which it was entitled.

¶ 96 Finally, Jorge claims that the GAL failed to adequately explore A.E.C.'s relationship with his extended family in Illinois. Jorge notes that the GAL admitted that she did not mention in her

written recommendation Jorge's concern that relocating A.E.C. to California would isolate the minor from "significant relationships with his extended family in Illinois," she did not question his mother (Peterson) about A.E.C.'s extended family in Illinois, and she did not meet Peterson's husband, Jorge's sisters, or A.E.C.'s cousins. However, the GAL acknowledged at the hearing that Jorge expressed concern that relocating A.E.C. to California would isolate the minor from his extended family in Illinois, and she testified that she considered this factor in reaching her recommendation. Moreover, the GAL acknowledged that A.E.C. had relatives in Illinois with whom he is very close. In addition, Jorge, his mother, and one of his sisters testified at the relocation hearing about A.E.C.'s relationship with his extended family in Illinois. Thus, the trial court had before it evidence regarding A.E.C.'s relationship with his extended family in Illinois.

¶ 97                                III. CONCLUSION

¶ 98    For the reasons set forth above, we affirm the judgment of the circuit court of Du Page County denying Jorge's motion to dismiss Suni's relocation petition and granting Suni's petition to relocate from Illinois to California with A.E.C.

¶ 99    Affirmed.